McKenzie Czabaj, AZ Bar No 036711
David A. Chami, AZ Bar No. 027585
Daniel Cohen, AZ Bar No. 032552
**CONSUMER ATTORNEYS, PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Email: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff Mustafa Othman*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mustafa Othman,<br><br>        Plaintiff,<br>    v.<br><br>Safety Holdings, Inc. d/b/a SambaSafety,<br><br>        Defendant. | **Case No.:**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Mustafa Othman ("Plaintiff" or "Mr. Othman") by and through his counsel brings the following Complaint against Safety Holdings, Inc. d/b/a SambaSafety ("Defendant" or "SambaSafety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's employer, which falsely portrayed Plaintiff as having his non-commercial driving privileges revoked.

## INTRODUCTION

1.     This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

1

2.      Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3.      Defendant falsely reported to Plaintiff's employer that Plaintiff's driver's license had been revoked. Defendant's reporting is grossly inaccurate and untrue.

4.      Plaintiff's non-commercial driver's license was not revoked, only his commercial (CDL) license was revoked.

5.      Plaintiff's employer terminated Plaintiff's job after receiving an employment background check report from Defendant, which included the inaccurate driver's license suspension.

6.      Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the available motor vehicle records from the Arizona Department of Transportation ("ADOT") regarding the license suspension prior to publishing Plaintiff's report to his employer.

7.      Had Defendant performed even a cursory review of the motor vehicle records, it would have discovered that Plaintiff's non-commercial driver's license was not suspended, only his commercial (CDL) license was suspended at the time of Defendant's report.

8.      Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9.      Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their employers and prospective employers with inaccurate information.

10.     Defendant's inaccurate report cost Plaintiff a good paying job and job security.

11.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12.    As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

## PARTIES

13.    Mustafa Othman ("Plaintiff" or "Mr. Othman") is a natural person residing in Tucson, Arizona, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14.    Defendant Safety Holdings, Inc. d/b/a SambaSafety ("Defendant" or "SambaSafety") is a Delaware corporation doing business throughout the United States, including the State of Delaware and in this District, and has a principal place of business located at 8801 Horizon Blvd. NE, Suite 200, Albuquerque, NM 87113. Defendant may be served through its Registered Agent, CT Corporation System, located at 3800 N. Central Ave., Suite 160, Phoenix, AZ 85012.

15.    Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

16.    Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for

employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

19.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

20.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

21.     Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

22.     Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

/ /

**THE FCRA'S PROTECTIONS FOR JOB APPLICANTS**

23.     Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

24.     The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

25.     In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

26.     The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

27.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28.     Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

**DEFENDANT'S ILLEGAL BUSINESS PRACTICES**

29.     Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

/ /

30.    As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

31.    The criminal background check industry takes in revenues in excess of three billion dollars, annually.

32.    Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the underlying court records are rarely directly reviewed in creating criminal background checks.

33.    Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

34.    Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

35.    Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

36.    Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs

---

[1]    CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

37.     Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

38.     Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting that Plaintiff's non-commercial driver's license was suspended, rather than Plaintiff's commercial (CDL) license.

39.     As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff's Employment with Uber

40.     Plaintiff had been working as a Driver with Uber since 2017.

41.     Plaintiff enjoyed his employment with Uber; he found the ability to make his own schedule particularly valuable and intended to continue to work for Uber for the foreseeable future.

### Defendant Published an Inaccurate Background Check Report to Uber

42.     Uber contracted with Defendant to conduct background checks, including motor vehicle record checks, on its employees and prospective employees.

43.     On or about January 2, 2024, Uber ordered a criminal background check on Plaintiff from Defendant.

44.     On or about January 2, 2024, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Uber.

45.     Within that consumer report, Defendant published inaccurate information about Plaintiff.

46.    Specifically, Defendant's consumer report about Plaintiff included grossly inaccurate and stigmatizing information suggesting that Plaintiff's non-commercial driver's license was suspended or revoked, which appeared in the consumer report as follows:

```
TYPE VIOL/SUSPE CONV/REINS HISTORY ENTRY                            PTS
---- ---------- ---------- -----------------------------------    -----
VIOL 06/24/2022            FAILURE TO SURRENDER CDL LICENSE OR PERMIT   0
                          City/Location.......: ARIZONA
                          Commercial Vehicle..: N
                          Hazardous Materials.: N
                          Accident Involved...: N
                          Event Type..........: VIOLATION
                          ACD.................: B80
                          State Code..........: 28-3314
                          AVD.................: DB15

VIOL 06/24/2022            FAILURE TO SURRENDER CDL LICENSE OR PERMIT   0
                          City/Location.......: ARIZONA
                          Commercial Vehicle..: N
                          Hazardous Materials.: N
                          Accident Involved...: N
                          Event Type..........: VIOLATION
                          ACD.................: B80
                          State Code..........: 28-3314
                          AVD.................: DB15

SUSP 06/25/2022 07/26/2022 FAILURE TO SURRENDER CDL LICENSE OR PERMIT
                          City/Location.......: ARIZONA
                          Miscellaneous.......: COMPLETE REVIEW BY
                                                MEDICAL REVIEW PROGRAM
                                                (MRP), STATUS:
                                                SATISFIED, DATE:
                                                07/26/2022
                          Event Type..........: SUSPENSION
                          Court...............: AZ - ARIZONA
                          Mail Date...........: 06/25/2022
                          ACD.................: B80
                          State Code..........: 28-3314
                          ACD Code............: 28-3314
                          AVD.................: DB15

REVO 07/10/2022 07/26/2022 FAILURE TO SURRENDER CDL LICENSE OR PERMIT
                          Event Type..........: REVOCATION
                          Miscellaneous.......: PAY CDL REVOCATION
                                                REINSTATEMENT FEE,
                                                STATUS: SATISFIED, DATE:
                                                07/26/2022, COMPLETE
                                                REVIEW BY MEDICAL REVIEW
                                                PROGRAM (MRP), STATUS:
                                                SATISFIED, DATE:
                                                07/26/2022
                          City/Location.......: ARIZONA
                          State Code..........: 28-3314
                          Court...............: AZ - ARIZONA
                          Rein Eligib Date....: 07/26/2022
                          Mail Date...........: 06/25/2022
                          ACD Code............: B80
                          AVD.................: DB15
```

47.    The driver's license revocation reported by Defendant about Plaintiff is inaccurate.

48.    Plaintiff has never had his non-commercial driver's license revoked or suspended in his life.

49.    A cursory review of the available motor vehicle records confirms that Plaintiff's non-commercial driver's license was not revoked or suspended. Rather, the record confirms that Plaintiff's commercial (CDL) license was temporarily revoked and suspended.

50.    Furthermore, Defendant reported an inaccurate ACD code associated with the entries on the report related to the CDL suspension/revocation.

51.    For each entry, Defendant reported an ACD code of B80.

52.    A cursory review of the available motor vehicle records confirms that the ACD Code for the suspension/revocation is actually W82.

53.    According to the AAMVA Code Dictionary (ACD) [2], B80 means "Failed to surrender driver license (includes Dl, CDL, and Instruction Permit), and W82 means "Failure to surrender license or permit or otherwise comply with jurisdiction requirements."[3]

54.    Furthermore, ACD Code B80 has been "retired" by the AAMVA since 2005.[4]

55.    As a procurer of motor vehicle records, Defendant is familiar with ACD codes and knew or should have known B80 has not been in use since 2005.

---

[2] The American Association of Motor Vehicle Administrators (AAMVA) has published a set of codes, which are identified in the AAMVA Code Dictionary ("ACD"). These ACD codes are used by State Driver Licensing Agencies nationwide to identify (1) the type of conviction or (2) the reason for a withdrawal. *See*, AAMVA Code Dictionary Manual 5.2.5, https://www.aamva.org/getmedia/b1fd2b7f-8040-4764-9b4e-4ca464c43a2c/AAMVA-Code-Dictionary-Manual-5-2.pdf (last accessed June 12, 2024).
[3] See, *id*. at p. 40 and 123.
[4] See, *id*. at p. 121 and 123.

56.     The sole reason the inaccurate license revocation/suspension was reported was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Plaintiff's employer.

57.     Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's non-commercial driver's license was not revoked or suspended.

58.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Uber Terminates Plaintiff's Employment**

59.     In or around January 2024, Plaintiff was notified by Uber that his employment was terminated as a direct result of information on the consumer report.

60.     Plaintiff did not immediately see this notice as he was out of the country at the time.

61.     After returning to the United States in February 2024, Plaintiff realized he was unable to access Uber. This is when he discovered the earlier email from Uber regarding his background check and employment.

62.     Shortly thereafter, Plaintiff obtained a copy of the subject consumer report and was shocked upon reviewing the driver's license revocation and suspension contained within the subject consumer report.

63.     Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting that his non-commercial driver's license was revoked, both in relation to the Uber position, but also the impact of the same on his future.

64.    Specifically, Defendant reported that Plaintiff's driver's license had been revoked and suspended. Rather, **only** Plaintiff's **commercial** driver's license had been revoked and suspended, because he forgot to submit his USDOT medical exam report.

65.    Moreover, Plaintiff's commercial driver's license was actually *reinstated* on July 26, 2022, after he submitted his USDOT medical exam.

66.    The motor vehicle records were available to Defendant prior to publishing Plaintiff's consumer report to Uber, but Defendant failed to obtain or perform even a cursory review of such information.

**Plaintiff Disputed the Misinformation in Defendant's Consumer Report**

67.    On February 28, 2024, desperate to regain employment with Uber and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Defendant. Plaintiff disputed via telephone with Defendant.

68.    Plaintiff identified himself and provided information to Defendant to support his dispute.

69.    Plaintiff specifically disputed the inaccurate reporting that his personal driver's license was revoked and suspended, as that was not the case.

70.    Plaintiff specifically asked Defendant to investigate and correct its reporting in any consumer report about Plaintiff.

71.    On March 21, 2024, Plaintiff received Defendant's correspondence confirming that it had reinvestigated Plaintiff's dispute.

72.    Defendant also conceded its inaccurate reporting by stating it corrected the report to no longer reflect "Failure to Surrender CDL LIC/PERMIT."

73.    Plaintiff reasonably believes that due to Defendant's inaccurate reporting in the first instance, Uber formed a negative opinion about Plaintiff.

74.    Defendant's false report cost Plaintiff a well-paying job with Uber.

75.    As of the date of the filing of this complaint, Plaintiff's Uber account remains deactivated due to Defendant's violations of the FCRA.

76.    Since being unable to regain his employment with Uber, Plaintiff has since begun work for DoorDash so that he may be able to afford his bills and otherwise support himself.

77.    Plaintiff is far less satisfied with his DoorDash employment and would prefer to resume employment for Uber where the work is better quality, and the earnings are better.

78.    Plaintiff is also concerned that he will be unable to support himself and his spouse.

79.    Furthermore, Plaintiff was very embarrassed by Defendant's inaccurate reporting.

80.    The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

81.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

/ /

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

82.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

83.    Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

84.    At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

85.    At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

86.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

87.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; loss of time trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

88.    Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

89.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Determining that Defendant negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 30th day of July 2024.

**CONSUMER ATTORNEYS, PLC**

By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No 036711
David A. Chami, AZ Bar No. 027585
Daniel Cohen, AZ Bar No. 032552
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Email: mczabaj@consumerattorneys.com

*Attorneys for Plaintiff Mustafa Othman*

- 14 -